[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 21, 2010
JOHN LEY
ACTING CLERK

_____

No. 09-11074

_____

D. C. Docket No. 07-00257-CV-FTM-29-DNF

ROBERT MORAN,

Plaintiff-Appellant,

versus

BILL CAMERON,
JOHN DAVENPORT,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 21, 2010)

Before CARNES and HULL, Circuit Judges, and LAWSON,[*] District Judge.

LAWSON, District Judge:

_____

[*] Honorable Hugh Lawson, United States District Judge for the Middle District of Georgia, sitting by designation.

Robert Moran ("Moran"), the plaintiff in this case, appeals from the district court's order granting final summary judgment to defendants John Davenport ("Davenport"), the Charlotte County Sheriff, and Bill Cameron ("Cameron"), the Charlotte County Deputy Sheriff, on the basis of qualified immunity. Cameron arrested Moran for refusing his order to leave the Cultural Center of Charlotte County ("Cultural Center"), in violation of Florida's trespass after warning statute, Fla. Stat. § 810.09(2)(b). Moran claims that the officers[1] violated his Fourth Amendment rights because they arrested him without probable cause and made false post-arrest statements to manufacture probable cause. He also claims they violated his First Amendment rights because no reasonable police officer would have arrested him for engaging in political speech at the Cultural Center.

This Court reviews "de novo a district court's disposition of a summary judgment motion based on qualified immunity, applying the same legal standards as the district court." Whittier v. Kobayashi, 581 F.3d 1304, 1307 (11th Cir. 2009) (citation omitted). "We resolve all issues of material fact in favor of the plaintiff, and then, under that version of the facts, determine the legal question of whether the defendant is entitled to qualified immunity." Id. (citation omitted).

Our analysis proceeds as follows: first, we state the facts of the case in the

---

[1] The term "officers" refers to Cameron and Davenport only.

2

light most favorable to Moran. Next, we explain why, under that version of the facts, Cameron and Davenport had arguable probable cause to arrest Moran for violating Florida's trespass after warning statute. Then we explain why Cameron and Davenport did not manufacture probable cause and therefore are entitled to qualified immunity on the Fourth Amendment claim. Finally, we explain that because the officers had arguable probable cause to arrest Moran, they also are entitled to qualified immunity on the First Amendment claims. We affirm the district court's grant of final summary judgment.

## I. BACKGROUND

### A. Factual Background

The Cultural Center of Charlotte County, Inc. ("the Corporation") is a non-profit corporation that leases the Cultural Center building and parking lot from Charlotte County for $1 per year. The Corporation initially owned the property, but donated it to Charlotte County, which in turn leased it back to the Corporation. The Corporation is self-supporting and draws on no public monies for operating costs. It generates its own income through room rental and food and craft sales and is totally funded by user fees and donations.

On October 16, 2006, the campaign for Joe Negron, a local candidate for the

Republican party, rented two rooms at the Cultural Center to conduct a political rally in support of Negron's candidacy. The then governor of Florida, Jeb Bush, was scheduled to attend the rally. Moran, the president of "the Democratic club" in Charlotte County, decided to come to the Cultural Center when he learned that the governor would be there. He initially entered the Cultural Center building wearing a local Democratic party T-shirt. After arriving at the Cultural Center, however, Moran decided to change into a "Florida for Peace" shirt and carry a sign to protest the Iraq war. He returned to his car to change his shirt and removed a homemade picket sign from his trunk. The sign was approximately twenty inches long by thirty inches wide and was mounted on a stick. On one side the sign said, "Dumb Men Start Wars," and on the other side, it said "Guided by God – George and Osama."

As Moran walked up the sidewalk leading to the front doors of the Cultural Center, David Powell ("Powell"), the volunteer president of the Cultural Center's Board of Directors, came outside and told Moran that he could not bring the sign into the building. Moran told Powell at least twice that Powell was violating Moran's First Amendment rights, to which Powell responded, "Yes, I am." According to Moran, Powell never told Moran to leave the property. After Moran asked him who he was, Powell introduced himself as the president of the Cultural

Center.  Moran then walked away from the entrance and stood beside a bench outside the building, fourteen feet away from the front door.  Powell returned to the inside of the Cultural Center.

Sheriff Davenport, who was dressed in his sheriff's uniform, and Deputy Sheriff Cameron, who was dressed in plain clothes, observed Moran and Powell's interaction from inside the Cultural Center.  Davenport was at the Cultural Center to meet the Governor, and Cameron had paused in the lobby of the Cultural Center after attending a luncheon speech given by a candidate for Lieutenant Governor of Florida.

While watching the encounter between Powell and Moran, Cameron asked Davenport whether the Cultural Center was public or private property.  Davenport, who was a member of the Board of Trustees of the Cultural Center, told Cameron that it was private property.  Davenport had not seen the lease prior to the date of the arrest.  It was his understanding that Charlotte County owned the building and the grounds, but leased it to the management of the Corporation, a private entity.  It was also his understanding that it was a landlord-tenant relationship that allowed the Corporation to control the entire property, including the parking lot and the walkways.  Davenport was not aware of any rules governing the rental of rooms at the center, but he was aware that there was a rule against political signs on the

common areas of the Cultural Center, such as the lobby and the walkways. Moreover, it was his understanding that the Corporation could exclude citizens from using the facility for certain purposes, such as skateboarding, and if they refused to leave, they could be arrested for trespassing.

Upon returning to the inside of the Cultural Center, Powell spoke with Cameron and Davenport. At the time of the exchange, Cameron did not know Powell, but Powell and Davenport knew one another because both served on boards of the Cultural Center and they had served together on various other boards in the past.

Powell told Cameron and Davenport that Moran was not leaving. According to Cameron, he asked Powell whether he wanted Moran removed, whether Powell was a manager at the Cultural Center, and whether the Cultural Center was private property. Powell said that he wanted Moran removed, said that he was a manager at the Cultural Center, and confirmed that the property was private. Cameron then told Powell that he would go out and speak to Moran. Cameron left the group and went outside.

Powell remembers telling the officers that Moran was not leaving and that one of the officers told him "we'll take care of it." He does not remember Cameron or Davenport saying anything else to him at that time. He interpreted the statement

6

"we'll take care of it" to mean that the officers would remove Moran from the property.

Once outside the Cultural Center, Cameron introduced himself to Moran and said, "this is private property and they want you off the property." Moran told Cameron, "you're taking away my First Amendment rights." Cameron then offered Moran the option of holding his sign on the sidewalk across the parking lot, but Moran refused the offer and stayed where he was. Moran then asked whether he could enter the Cultural Center without his sign. Cameron replied, "they want you off the property." Moran continued to refuse to leave the property, even after Cameron warned him that he would arrest Moran for remaining on the property after having been warned to leave. After receiving a final warning from Cameron, Moran told Cameron to arrest him. Cameron then arrested Moran for trespass after warning in violation of Fla. Stat. § 810.09(2)(b).

Following Moran's arrest, Cameron and Moran walked to the parking lot and Cameron radioed for a patrol car. Davenport observed Cameron and Moran's interaction from inside the Cultural Center, and when he saw Cameron and Moran walking toward the parking lot, Davenport followed. Cameron told Davenport that he had arrested Moran after Moran had not moved despite being informed that the Cultural Center was private property. At no time did Davenport and Moran speak

to each other.

Deputy April Strejcek ("Strejcek") arrived in a patrol car. Moran was searched, handcuffed, and placed in the patrol car. Cameron advised Strejcek that Moran was under arrest for trespassing. Cameron never told Strejcek that Davenport had told him to arrest Moran. After Moran was placed in the patrol car, Strejcek filled out paperwork on the trunk of her patrol car with Joan Robbins ("Robbins"), the Cultural Center's Assistant Executive Director and a paid employee.

Robbins was then asked to sign a "trespass warning notice" and a "victim witness statement," which she did. She signed the warning notice because one of the officers told her that Powell's signature would not be sufficient because he was not a paid employee. Robbins did not witness the incident where Powell told Moran he could not bring his sign into the Cultural Center building. She also did not speak to Cameron and was not present when Cameron asked Moran to leave. However, Strejcek testified that at the time she took Moran into custody, she had the impression that it was Robbins who had asked Moran to leave and then contacted Cameron for assistance. In the probable cause affidavit, Strejcek wrote that Cameron told her that Robbins first saw Moran, asked him to leave the property, and sought out Cameron's assistance when Moran refused to leave. The

victim witness statement that Robbins signed also said that Robbins asked Moran to leave and then asked Cameron for help when Moran did not move.

## B.    Procedural History

On April 25, 2007, Moran brought this 42 U.S.C. § 1983 civil rights complaint against Cameron and Davenport in the United States District Court for the Middle District of Florida.  Moran alleged that Cameron and Davenport arrested Moran without probable cause in violation of the Fourth Amendment, denied his right to peaceably assemble in violation of the First Amendment, and denied his right to engage in political speech in violation of the First Amendment.

The bases of Moran's claims were that: (1) no "authorized person" warned him to leave the property as required by the Florida trespassing statute; (2) the officers fabricated the fact that Robbins told him to leave in order to create probable cause to arrest him;  and (3) no reasonable officer could believe that ordering him to leave the Cultural Center did not violate his First Amendment rights.

Cameron and Davenport moved for summary judgment claiming qualified immunity.  The district court granted their motions, concluding that the officers had arguable probable cause to arrest Moran for violating the trespass after warning

statute because under the circumstances a reasonable officer could rely on Powell's request to remove Moran when deciding to arrest Moran for trespass. The district court then concluded that the officers had qualified immunity as to the First Amendment claims because they had arguable probable cause to arrest Moran, even though Moran was exercising his First Amendment right to expression at the time of the arrest. This timely appeal followed.

## II. DISCUSSION

### A. Qualified Immunity Framework

"The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Case v. Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). "Qualified immunity is meant to ensure that government officials are not afraid to fulfill their job-related responsibilities." Williams v. Consol. City of Jacksonville, 381 F.3d 1298, 1307 (11th Cir. 2004) (citation omitted). Thus, all but those who are plainly incompetent or knowingly violate the federal law are protected from suit. Lee v. Ferraro, 284

F.3d 1188, 1194 (11th Cir. 2002).

In order to be protected by qualified immunity, an officer must first show that he was engaged in a discretionary function when the alleged constitutional violation occurred. Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004). The burden then shifts to the plaintiff to overcome the defense of qualified immunity. Id. The Supreme Court established in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L.Ed.2d 272 (2001), that qualified immunity must be granted to a government official unless the plaintiff shows: first, that the facts viewed in the light most favorable to him establish a constitutional violation by the official; and, second, that the unlawfulness of the official's conduct was clearly established at the time of the incident. McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir. 2009).

We are no longer required to conduct the qualified immunity analysis in the order articulated by Saucier v. Katz. Instead, we may first resolve the second question, whether the constitutional right was "clearly established," before we turn to the first question, whether a constitutional right was actually violated. Pearson v. Callahan, 129 S. Ct. 808, 813 (2009). In deciding which of the two prongs of the qualified immunity analysis should be addressed first, we are "permitted to exercise [our] sound discretion." Id. at 818. Regardless of which prong is addressed first,

11

our inquiry still "must be undertaken in light of the specific context of the case, not as a broad general proposition." Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009) (citation omitted).

It is undisputed that the officers were acting within their discretionary authority when they arrested Moran. Therefore, our qualified immunity analysis focuses on whether Moran has satisfied his burden of showing that the grant of qualified immunity is inappropriate. We choose to first address the second prong of the Saucier test's two-prong inquiry and ask whether the officers' arrest of Moran was clearly established as unconstitutional because it lacked arguable probable cause. We hold that the officers had at least arguable probable cause to arrest Moran.

## B.     The Officers Had Arguable Probable Cause to Arrest Moran

Moran complains that Cameron and Davenport violated his Fourth Amendment rights because they falsely arrested him for violating Fla. Stat. § 810.09(2)(b). The Fourth Amendment provides that a person has a right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. Whether an arrest of a person, which is a seizure, is reasonable depends on a finding of probable cause. Kingsland, 382 F.3d at 1226. "Probable cause to arrest exists where the facts and circumstances within the officers' knowledge and of which

they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir. 1990) (quotations and citation omitted). A warrantless arrest without probable cause violates the Constitution. Kingsland, 382 F.3d at 1226.

Nevertheless, "[w]e do not automatically hold an officer liable for making an arrest that, when seen with the benefit of hindsight, turns out not to have been supported by probable cause." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007). Rather, if an officer violates the Constitution because he lacks probable cause, the officer may still be shielded from liability under the second prong of the qualified immunity analysis because his "actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Case, 555 F.3d at 1327 (quoting Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L.Ed.2d 666 (2002)).

In wrongful arrest cases, we have defined the "clearly-established" prong as an "arguable probable cause" inquiry. See id. ("If a constitutional violation occurred because the officer lacked probable cause, we next consider whether arguable probable cause existed."); Draper v. Reynolds, 369 F.3d 1270, 1276 n. 7 (11th Cir. 2004) ("Given our conclusion that [defendant] had actual probable cause

13

and no constitutional violation occurred, we need not discuss the arguable probable cause doctrine ... for purposes of determining the second prong of the qualified immunity test."); Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001) ("Because [defendant] had arguable probable cause to arrest [plaintiff], he violated no clearly established law. . . .").  The "clearly-established" standard  means that even if the arresting officer lacks probable cause, he is still entitled to qualified immunity if there was "arguable probable cause for the arrest, which is a more lenient standard than probable cause."  Knight v. Jacobson, 300 F.3d 1272, 1274 (11th Cir. 2002).

In determining whether arguable probable cause exists we ask whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." Lee, 284 F.3d at 1195 (quotations and citations omitted).  There is no arguable probable cause if "no reasonable officer could have found probable cause under the totality of the circumstances." Kingsland, 382 F.3d at 1232.

We find that the facts, taken in the light most favorable to Moran, show that Cameron and Davenport had at least arguable probable cause to arrest Moran.[2]  We

---

[2]   There is no evidence that Davenport arrested Moran or directed Cameron to arrest Moran.  Nevertheless, we conduct our arguable probable cause analysis as if both officers arrested Moran.

14

make this conclusion for three reasons: (1) there is no genuine issue of fact that Powell asked the officers to order Moran to leave the Cultural Center's property; (2) a reasonable officer could believe that Powell was an "authorized person" as required by the Florida trespassing statute; and (3) an officer could reasonably believe that ordering Moran to leave the Cultural Center's property did not violate Moran's First Amendment rights.

**1.    There is no genuine issue of fact that Powell asked the officers to remove Moran.**

Florida statute § 810.09 is titled "Trespass on property other than structure or conveyance." Moran was arrested for violating subsection (2)(b) of the statute, which states in relevant part: "[i]f the offender defies an order to leave, personally communicated to the offender by the owner of the premises or by an authorized person . . . the offender commits a misdemeanor of the first degree . . . ." Subsection (3) defines "authorized person" as

> any owner, his or her agent, or a community association authorized as an agent for the owner, or any law enforcement officer whose department has received written authorization from the owner, his or her agent, or a community association authorized as an agent for the owner, to communicate an order to leave the property in the case of a threat to public safety or welfare.

Fla. Stat. § 810.09(3).

15

Moran argues that there is an issue of fact of whether Powell asked the officers to order Moran to leave. If Powell never gave the officers such an order, then Cameron would not have had even arguable probable cause for the arrest.

Under Moran's version of the facts, Powell told Moran that he could not enter the building with his sign. Thus, according to Moran, Powell never asked him to leave the Cultural Center. Moran relies on Powell's testimony for his assertion that Powell also never asked the officers to remove him from the property. Powell testified that after he told Moran he could not enter the building with his sign, Powell returned to the inside of the Cultural Center, located the officers, who were standing together, and said "[h]e's not moving." One of the officers then said "we'll take care of it." Powell testified that he could not remember anything else that Davenport or Cameron said to him at that time, but he understood "we'll take care of it" to mean that the officers would order Moran to leave the Cultural Center's property.

While we could hold that a reasonable officer in Cameron's or Davenport's shoes could have perceived Powell's statement "he's not moving" to be a request for the officers to order Moran to leave the property, we decline to do so because there is other unrebutted testimony, which is not inconsistent with Powell's testimony, that shows that Cameron expressly asked Powell whether he wanted

16

Moran removed from the property. Cameron testified that when Powell came back inside the Cultural Center building, Cameron asked Powell whether he was a member of the management, asked him if he wanted Moran removed, and finally asked him if the Cultural Center was private property. After receiving Powell's affirmative answers, Cameron told Powell he would go outside and talk to Moran.

Powell's testimony does not create a genuine issue of fact. Rather, Cameron's testimony adds to and expands upon Powell's limited testimony about the conversation that occurred between the officers and Powell. Powell admitted that he could not remember anything said by Davenport or Cameron other than "we'll take care it," but that he interpreted the statement to mean that one of the officers would order Moran to leave. Cameron's testimony was directly consistent with Powell's in that both established that one of the officers agreed to go outside and speak to Moran. Cameron's testimony then filled in the gaps left by Powell's. Thus, on this record testimony, we cannot conclude that Moran has created a genuine issue of fact regarding whether Powell asked the officers to order Moran to leave.

2. **A reasonable officer could believe Powell was an "authorized person."**

Having determined that there is no genuine issue of fact whether Powell

17

asked the officers to order Moran to leave, the "authorized person" question left before us is whether a reasonable officer could believe that Powell was an agent of the Cultural Center for purposes of asking Cameron to warn Moran to leave.

Under Florida law, an agent may have actual or apparent authority to act on behalf of the principal. A finding of actual authority requires evidence that the principal acknowledged that the agent would act for him, that the agent accepted the responsibility of acting on behalf of the principal, and that the principal maintained control over the agent's actions. Villazon v. Prudential Health Care Plan, Inc., 843 So. 2d 842, 853 n.10 (Fla. 2003) (citing Goldschmidt v. Holman, 571 So. 2d 422, 424 n. 5 (Fla.1990)).

In contrast, an agency relationship based on apparent authority exists if there is a representation by the principal, reliance on the representation by a third person, and a change in position by the third party in reliance on the representation. Mobil Oil Corp. v. Bransford, 648 So. 2d 119, 124 (Fla.1995).

It is plain to us that officers in Cameron's and Davenport's positions could have reasonably perceived that Powell had actual authority to act on behalf of the Cultural Center in deciding who could be present on the property. It is undisputed that Davenport served on the Board of Trustees of the Cultural Center and that he knew that Powell served as the Cultural Center's volunteer president of the Board

of Directors. Powell's authority as president could indicate to a reasonable officer that he had broad, general management authority at the Cultural Center, including the authority to determine who could be present on the property. The fact that Powell served as a volunteer and was not paid does not make it less reasonable for an officer to believe that Powell had authority to act or speak on behalf of the Cultural Center.

Cameron's perception that Powell had authority to ask him to order Moran to leave was also one that a reasonable officer could have. Although Cameron did not know that Powell was the volunteer president of the Cultural Center, he observed Powell prevent Moran from entering the building. Powell's conduct could indicate to a reasonable officer that Powell had a position of authority at the Cultural Center. Most importantly, however, Cameron asked Powell whether he held a management position at the Cultural Center. Powell stated he was a manager before Cameron went outside to order Moran to leave. We find that a reasonable officer, having been told by Powell that he was a manager of the Cultural Center, could believe that Powell had the authority to control who could be present on the Cultural Center's property.

Moran argues that there is evidence indicating the officers did not subjectively believe that Powell was an "authorized person." The analysis of

arguable probable cause is not concerned with the subjective beliefs of the officers. The standard for probable cause and arguable probable cause focuses on the facts and circumstances known to the arresting officer at the time, but it does not consider at all his subjective beliefs or motivations. United States v. Street, 472 F.3d 1298, 1305 (11th Cir. 2006) ("The officer's own subjective opinions or beliefs about probable cause are irrelevant, because it is an objective standard."). Instead, the standard asks whether a reasonable officer would have or could have believed that a crime had been committed or was being committed. Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). Thus, whether there is evidence that raises the inference that Cameron and Davenport did not subjectively believe that Powell had actual or apparent authority to speak for the Cultural Center is immaterial.

We note that in his reply brief Moran argues that no "authorized person" issued him a trespass warning because Cameron received a verbal authorization from Powell, and the Florida statute clearly establishes that an officer must receive written authorization from the property owner or his agent before issuing a trespass warning. He did not raise this issue in his initial brief before this Court. We have consistently and expressly stated that we will not "consider issues raised for the first time in an appellant's reply brief." United States v. Britt, 437 F.3d 1103, 1104

20

(11th Cir. 2006) (quoting United States v. Levy, 416 F.3d 1273, 1276 n. 3 (11th

Cir. 2005)).  Because Moran did not assert in his opening brief that summary

judgment was inappropriate on the basis that Cameron must have received written

authorization to issue him a trespass warning, we decline to consider the issue.


### 3.    A reasonable officer could believe that ordering Moran to leave did not violate his First Amendment rights.

Finally, we address Moran's argument that the officers lacked arguable

probable cause because no reasonable officer could believe that ordering Moran to

leave the Cultural Center's property did not violate Moran's First Amendment

rights.  The officers concede that there may be some evidence that the Cultural

Center has been opened and designated as a place for public discourse, but it is

undisputed that Cameron asked Davenport whether the property was private, and

Davenport told him that it was private property.  Moran has failed to produce any

evidence demonstrating that Cameron's reliance on this statement from Davenport

was unreasonable.  Davenport also testified that he believed, based on the landlord-

tenant relationship, that the property was "private" because the Corporation had the

right to control it and was leasing it from the County.  Davenport's understanding

may have been erroneous, but Moran has failed to provide any reasons why his

21

understanding was unreasonable. On these facts, a reasonable officer could believe that the property was private and not a place for First Amendment expression, and therefore that there was a basis for Moran's arrest under the trespass statute when he refused to leave the property.

Further, Moran has presented no evidence that it was clearly established as unreasonable for the officers to believe that at a minimum the Cultural Center's walkway and parking lot were not a public forum for engaging in free speech. A party may show that the law was clearly established by pointing to "a materially similar case [that has] already decided that what the police officer was doing was unlawful," or demonstrating that "the words of the pertinent federal statute or federal constitutional provision . . . [are] specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in total absence of case law. This kind of case is one kind of 'obvious clarity' case." Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (quotations and citation omitted).

In determining whether there is a materially similar case that establishes the unlawfulness of an officer's conduct, we look to the precedents of the United States Supreme Court, this Court, and the highest court of the relevant state. Vinyard, 311 F.3d at 1351 n. 22.

Moran has not provided, and our own research has not revealed, any case from the Eleventh Circuit, the Florida Supreme Court, or the United States Supreme Court that shows that asking Moran to leave the Cultural Center's surrounding walkway and move across the street to the sidewalk violated his First Amendment right to engage in protest speech. Moran refers us to Southeastern Promotions, Ltd. v. City of West Palm Beach, 457 F.2d 1016 (5th Cir. 1972). In that case, our predecessor court held that a city auditorium was subject to the requirements of the First Amendment because it was a public facility and had served as a venue for the communication of ideas and opinions. Id. at 1018-19.

We find Southeastern factually different and not materially similar. Unlike in Southeastern, where the auditorium was owned and controlled by the city, the Cultural Center is leased from the County by a private entity that controls what activities occur on the property. The Cultural Center is funded entirely by private funds, while the auditorium in Southeastern was funded by public money. Thus, the Cultural Center has more characteristics of private property, while the city auditorium in Southeastern was clearly public property. Because of these differences, we believe that Southeastern does not clearly establish that a reasonable officer would know that a privately leased building and its entrance and surrounding walkway, controlled by a private corporation, are designated public

23

forums for free speech.

There is case law that clearly establishes that the ability of the government to limit expressive activity is very limited in quintessential public forums, like streets and parks. See, e.g., Perry Educ. Ass'n v. Perry Local Educators' Ass'n., 460 U.S. 37, 45, 103 S. Ct. 948, 74 L.Ed.2d 794 (1983) ("In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which have immemorially been held in trust for the use of the public, and . . . have been used for purposes of . . . communicating thoughts between citizens, and discussing public questions.") (quotation omitted); Amnesty Intern., USA v. Battle, 559 F.3d 1170, 1182 (11th Cir. 2009) ("[Plaintiff] also has a constitutional right to engage in peaceful protest on public land such as in a city park.). Those cases are distinguishable. It is undisputed that Cameron offered Moran access to a sidewalk across from the Cultural Center, a quintessentially public place for protest, and Cameron and Davenport understood that the Cultural Center was private property.

Alternatively, Moran has not established that the First Amendment is so clear and the officers' conduct was so egregious that case law is not needed to establish that the conduct is unconstitutional. Accordingly, we conclude that it was not

"clearly established" that Moran had a right to free speech on the walkway to the Cultural Center, or that the Cultural Center was a public forum, such that the officers should have known it at the time of the arrest and should not have arrested him based on this knowledge

For these reasons, the officers had arguable probable cause to arrest Moran when he refused Cameron's order to leave the Cultural Center.

## C. The Officers' Post-Arrest Statements Do Not Show That They Manufactured Probable Cause

Moran also asserts that the officers manufactured the probable cause for his arrest. He argues that the officers fabricated the statements in the victim witness statement and asked Robbins to sign the trespass warning notice even though she did not ask Moran to leave the Cultural Center. Additionally, he takes issue with the probable cause affidavit, arguing that it falsely indicates that Robbins confronted Moran and told him to leave the property and then sought out Cameron's assistance when he refused to leave. According to Moran, if the officers reasonably believed that Powell was an authorized person then there would have been no reason to have Robbins sign the trespass warning notice and include false statements in the victim statement and probable cause affidavit.

The Warrant Clause of the Fourth Amendment requires that warrant

25

applications contain sufficient information to establish probable cause. Franks v.

Delaware, 438 U.S. 154, 164-65, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). We have

held that it is clearly established that the "Constitution prohibits a police officer

from knowingly making false statements in an arrest affidavit about the probable

cause for an arrest . . . if such false statements were necessary to the probable

cause." Jones v. Cannon, 174 F.3d 1271, 1285 (11th Cir. 1999); see also Holmes

v. Kucynda, 321 F.3d 1069, 1083-84 (11th Cir. 2003) (holding that the officer was

not entitled to qualified immunity where he submitted a warrant application that

included deliberately false statements about the incidents leading to the plaintiff's

arrest and there was no evidence of probable cause other than the facts

manufactured or falsified by him). "A search warrant may be voided if the affidavit

supporting the warrant contains deliberate falsity or reckless disregard for the truth,

and this rule includes material omissions." Dahl v. Holley, 312 F.3d 1228, 1235

(11th Cir. 2002). Nevertheless, a "warrant is valid if, absent the misstatements or

omissions, there remains sufficient content to support a finding of probable cause."

Id. (citation omitted).

Viewing all the evidence and disputed factual inferences in the light most

favorable to Moran, the misstatements in the probable cause affidavit that Robbins

first saw Moran, asked him to leave the property, and then requested Cameron's

assistance are immaterial since there are other sufficient facts to support a finding of arguable probable cause. Uncontroverted evidence in the record shows that Powell asked the officers to order Moran to leave, that Cameron asked Moran to leave, and that Cameron arrested Moran after he refused to move. Moreover, Powell told the officers he was a manager at the Cultural Center, and based on this representation, a reasonable officer could have believed that Powell had authority to ask the officers to order Moran to leave the Cultural Center's property. These facts form a basis for arguable probable cause separate from the facts stated in the affidavit. Therefore, we conclude that the officers are protected by qualified immunity.

We now address the misstatements in the victim witness statement and Robbins' signature on the trespass warning notice. Under Moran's version of the facts, Cameron arrested him and then brought him over to the side of the road where Strejcek soon arrived in her patrol car. Robbins then wrote the victim witness statement and signed the trespass warning notice. We find that the trespass warning notice and victim witness statement were not necessary to the probable cause determination and therefore any false information in them does not change our holding that the officers had arguable probable cause to arrest Moran. We make this conclusion for two reasons. First, both documents were made and signed

27

after the arrest was completed.[3]  Second, the Constitution prohibits knowingly or recklessly making false statements material to probable cause in an arrest affidavit. Kingsland, 382 F.3d at 1233.  This prohibition does not apply to the trespass warning notice and victim witness statement because, unlike the probable cause affidavit, they cannot be used to support an application for a warrant.  See U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by oath or affirmation . . . .").  Therefore,  regardless of whether the information in the trespass warning notice and victim witness statement was false or even fabricated, the information was not essential to the constitutional validity of the arrest.  It does not change the result that Cameron and Davenport had arguable probable cause to arrest Moran at the time of the arrest.

Because the post-arrest statements were not material to a finding of arguable probable cause, the officers did not manufacture probable cause.  Cameron and Davenport are accordingly entitled to qualified immunity from Moran's Fourth Amendment claim.

## D.    The Officers are Entitled to Qualified Immunity on the First Amendment Claims.

We finally address whether the officers are entitled to qualified immunity on

---

[3] Moran does not challenge on appeal the district court's finding that Cameron arrested him, not Strejcek.

28

Moran's First Amendment claims. We have held that "[w]hen a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested." Redd v. City of Enterprise, 140 F.3d 1378, 1383 (11th Cir. 1998) (holding that officers were protected by qualified immunity on a First Amendment claim where they had arguable probable cause to arrest a street preacher for disorderly conduct); accord Gold v. City of Miami, 121 F.3d 1442, 1446 (11th Cir. 1997) (holding that officers were protected by qualified immunity where they had arguable probable cause to arrest person who was talking loudly and cursing for disorderly conduct). This is also true when an officer has arguable probable cause to believe that a person is committing a particular offense, even if the person may be speaking at the time he is arrested. Redd, 140 F.3d at 1384.

Because we hold that the officers had arguable probable cause to arrest Moran, we conclude that the officers are entitled to qualified immunity from Moran's First Amendment claims.

### III. CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment to Davenport and Cameron on Moran's Fourth Amendment

wrongful arrest claim and his First Amendment claims.

**AFFIRMED**.