[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 19, 2002
THOMAS K. KAHN
CLERK

No. 01-15089
_____

D. C. Docket No. 00-00164 CV-D-S

SHIRLEY DAHL,

Plaintiff-Appellant,

versus

JIM HOLLEY, individually and as an employee
of the City of Dothan,
STEVEN PARRISH, individually and as an
employee of the City of Dothan, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

**(November 19, 2002)**

Before BIRCH and COX, Circuit Judges, and GEORGE[*], District Judge.

COX, Circuit Judge:

_____

[*]Honorable Lloyd D. George, U.S. District Judge for the District of Nevada, sitting by
designation.

In this civil rights action, Shirley Dahl appeals the district court's grant of summary judgment in favor of the City of Dothan, Alabama and several officers of the Dothan Police Department. Dahl claims that the officers and the City violated her rights under the First and Fourth Amendments to the United States Constitution in arresting her and searching her property. Because the record does not show that Dahl's constitutional rights were violated, we affirm.

## I. Background

### A. *Facts*[1]

This action arises from the circumstances underlying the investigation and arrest of Dahl by several police officers employed by the City of Dothan. The events leading up to Dahl's arrest began on December 12, 1997, when Sgt. Jim Holley received a tip from confidential informant Rustin McCardle that Dahl's son was in possession of illicit drugs. Based on McCardle's tip, Holley stopped and searched Dahl's son, finding him to be in possession of both cocaine and marijuana. Dahl's son gave a taped statement admitting that the drugs were his, and he was released. Later that night, Dahl's son told his mother that McCardle had provided the information resulting in his encounter with Holley.

---

[1] In reviewing the district court's disposition of a summary judgment motion, we are required to resolve all issues of material fact in favor of the non-moving party, which in this case is Dahl. *See Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992).

The next day, McCardle visited Dahl to inquire about her son. During this visit, McCardle told Dahl that he constantly was searched by the police and felt trapped. McCardle also told Dahl that he wanted to "get out," but he did not know how to do so. In the following months, Holley contacted Dahl's son on numerous occasions, attempting to recruit him as a confidential informant. Remembering McCardle's statements, and based on information gained from other sources, Dahl became concerned for her son's safety. She also disapproved of the tactics used by the police in recruiting confidential informants, which she thought to be corrupt and illegal.

Dahl brought these concerns to the attention of CLARA,[2] a citizens' group founded by Dahl to provide information about, and encourage reform of, the legal system. Another member of CLARA, Jeff Hargett, spoke to the mayor about the police department's recruitment and use of confidential informants, and the mayor agreed to investigate the matter if Hargett could provide evidence to corroborate CLARA's allegations. Dahl then contacted McCardle and asked him to meet with her.

Dahl and McCardle met on February 23, 1998, approximately one week after the police obtained an arrest warrant for her son.[3] Dahl told McCardle about CLARA and about her suspicion that the police department was corrupt. McCardle told Dahl

---

[2] "CLARA" stands for "Citizens for Legal Accountability and Reform in Alabama."

[3] Holley obtained the warrant on February 17, 1998.

3

that the information she had gathered about the police was correct, and he agreed to tell the same thing to Hargett the next day. At the meeting with Hargett, however, McCardle expressed concern that, if he helped CLARA, the police would resurrect old drug charges against him. Should that happen, McCardle indicated, he would not be able to afford an attorney for his defense. Dahl and Hargett pledged that CLARA would help McCardle and would pay up to $10,000 in attorney's fees on his behalf. Hargett then set up a meeting with the mayor, at which McCardle was to corroborate CLARA's allegations against the police department.

On February 25, 1998, concerned that his anonymity as a confidential informant had been compromised, McCardle telephoned the police department and asked to speak to Sgt. Antonio Gonzalez. McCardle inquired if Gonzalez had exposed him as the informant against Dahl's son. Gonzalez answered that he had not done so, but he informed McCardle that Dahl was spreading rumors that McCardle had planted drugs on her son. Gonzalez urged McCardle to come in and talk to the police about the situation. McCardle then talked to Holley, who said that McCardle was headed for trouble and also urged him to tell the police what was going on. McCardle told Holley that Dahl offered him $10,000 to lie about the facts and circumstances underlying the arrest of her son. After reporting McCardle's statements to Lt. Steve Parrish, Holley asked McCardle to provide a written statement of his interactions with Dahl.

In his written statement, McCardle repeated his accusation that Dahl offered him money to lie about the circumstances of her son's arrest. According to the statement, Dahl indicated that she "would do everything she could do to help her son," (R.2-48, Ex. 19 at 2), and she told McCardle that she wanted him to tell both Hargett and the mayor that "Holley set [her son] up." (*Id.* at 3.) After Dahl said this, according to the statement, McCardle sat back in his chair and remained silent for a few minutes. Eventually, Dahl allegedly said to him, "You want to know what is in it for you don't you [?]" (*Id.*) McCardle's statement indicated that Dahl then held up ten fingers and said "Ten Thousand." (*Id.*) Finally, the statement indicated that Dahl told McCardle to keep quiet about their arrangement when he talked to Hargett, because Hargett was "legit and would not have any part of an illegal act." (*Id.* at 4.)

After questioning McCardle about his statement, the police commenced an investigation of Dahl, conducted primarily by Sgt. Jon Beeson and Sgt. David Jay. As part of their investigation, the police monitored and recorded several telephone conversations between Dahl and McCardle. In a conversation on February 26, 1998, after McCardle indicated that he was having second thoughts, Dahl said "[l]et's just forget it then." (R.2-38, Ex. 6 at 2.) However, when McCardle remarked that he "would feel more comfortable . . . if [he] saw what [he] needed to see first," Dahl responded: "So you're not wrestling with your conscience then, you're wrestling with

5

your pocketbook." (*Id.* at 3.) Later in the same conversation, in response to McCardle's requests to see "that," Dahl said: "Then I have to take care of it all during the weekend and worry about getting ripped off." (*Id.* at 6.) In a subsequent conversation, on February 27, 1998, McCardle asked if Dahl was going to "show [him] anything" because he was "hurting" and needed "some money bad." (R.2-38, Ex. 8 at 1.) McCardle went on to express his concern that Dahl would not "hold up [her] end of the bargain." (*Id.* at 2.) Dahl responded: "You don't have to worry about that, I will, but . . . there is just no way I'm, that I . . . it's Friday night, and it's what . . . 8:10. There isn't a bank open in town. There is absolutely no way." (*Id.*)

The police also recorded several conversations between McCardle and Dahl on March 1, 1998, the night before the scheduled meeting with the mayor. In one conversation, McCardle told Dahl that he needed to know "are you gonna show me my money . . . before I go in that office," to which Dahl responded: "You know I wanted to help you with your situation . . . ." (R.2-38, Ex. 11 at 1-2.) In the same conversation, McCardle referred to lying both to Hargett and to the mayor, (*id.* at 2.), and at one point asked if Dahl was going to tell her husband "that you're gonna . . . pay me money . . . to lie for you." (*Id.* at 5.) To this last statement, Dahl responded: "I'm gonna tell him the truth." (*Id.*) Later that same day, McCardle told Dahl that "you want me to go in there and lie to the mayor." (R.2-38, Ex. 12 at 2.) To this

6

statement, Dahl responded: "No, I don't want you to go in there and lie to the mayor," (*id.*), and later in the conversation, she specifically told McCardle to tell the truth when he met with the mayor. (*Id.* at 5.) She also told McCardle that she would not give him the ten thousand dollars "under these circumstances." (*Id.* at 4.) In their last conversation that day, after making repeated references to his "ten grand," (R.2-38, Ex. 13 at 3), McCardle asked if Dahl would be able to help him out with his "attorney's fees." (*Id.* at 4.) Dahl responded: "If you need any . . . I feel like we can help you out." (*Id.*) Before ending the conversation, McCardle said: "And if you trust me, then I guess I'll receive attorneys fees, is that right?" (*Id.* at 5.) Dahl responded: "Alright." (*Id.*)

On March 2, 1998, around the time originally scheduled for the meeting with the mayor,[4] Dahl was arrested without a warrant and charged with bribing a witness. While Dahl was held at the police station, Beeson applied for and obtained search warrants for Dahl's home and business. In his affidavit seeking issuance of the warrants, Beeson recounted the events surrounding the search of Dahl's son, the statements made by McCardle, and some of the statements made by Dahl in her recorded conversations with McCardle. (R.2-38, Ex. 19.) Beeson did not, however,

_____

[4] The transcript of a recorded conversation that took place between McCardle, Hargett, and Dahl just prior to Dahl's arrest reveals that the meeting had been postponed until March 3, 1998.

include in the affidavit Dahl's statements that McCardle should not lie and that he should tell the truth to the mayor. The search warrants were executed by Beeson, Jay, and Officer Stacy Robinson, but none of the searches uncovered any incriminating evidence.

A preliminary hearing was held before the District Court of Houston County, Alabama, and the court found sufficient evidence against Dahl to bind the case over to a grand jury. The grand jury indicted Dahl on one count of bribing a witness in violation of § 13A-10-121 of the Code of Alabama, and the case proceeded to trial in the Circuit Court of Houston County. After the prosecution rested its case, the court found that the state had not produced evidence that McCardle had been or would be a witness in an official proceeding, one of the elements of the crime charged, and granted Dahl's motion for judgment of acquittal.

## B. *Procedural History*

After her acquittal, Dahl filed this action pursuant to 42 U.S.C. § 1983,[5] alleging that Holley, Parrish, Beeson, Jay, Gonzalez, and Robinson (collectively referred to as "the officers") violated her constitutional rights by: arresting her without probable cause, in violation of her rights under the Fourth Amendment; arresting her in retaliation for speaking out against the police department, in violation of her rights under the First Amendment; and unlawfully searching her property, in violation of her rights under the Fourth Amendment. Dahl also alleged that the City of Dothan violated her constitutional rights by inadequately training and supervising its police officers. Finally, Dahl alleged several state law claims against the officers and the City.

The officers and the City subsequently moved for summary judgment. The district court granted the motion as to Dahl's § 1983 claims. The district court first concluded that the officers were entitled to qualified immunity on Dahl's Fourth Amendment claims because they had arguable probable cause to make the arrest and because Dahl failed to demonstrate a constitutional violation with regard to the search of her property. The district court also concluded that, because the officers had

---

[5] The complaint also brought certain claims on behalf of Dahl's husband. Mr. Dahl, however, did not join the notice of appeal, and Dahl's counsel admitted at argument that Mr. Dahl was not a party to this appeal.

arguable probable cause to arrest Dahl, they were entitled to qualified immunity on her First Amendment claim as well. Finally, the district court determined that there was no custom or policy sufficient to hold the City liable for any constitutional deprivations. Having concluded that summary judgment was appropriate on Dahl's federal claims, the district court then declined to exercise its supplemental jurisdiction over her state law claims and dismissed those claims without prejudice. Dahl appeals.[6]

## II. Standard of Review

We review de novo the district court's grant of summary judgment, applying the same standard as the district court. *See Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1273 (11th Cir. 2002).

## III. Discussion

Dahl argues that we should reverse the district court because: (1) the officers are not entitled to qualified immunity on any of her constitutional claims against them; and (2) the district court did not adequately explain its reasons for granting summary judgment on her constitutional claims against the City. Because the facts do not

---

[6] In addition to the officers and the City, Dahl also sued McCardle for malicious prosecution and abuse of process under Alabama law. As with the state law claims against the officers and the City, the district court dismissed these claims against McCardle without prejudice.

demonstrate that Dahl suffered any constitutional deprivation, however, we find no reversible error in the district court's grant of summary judgment.

A. *Qualified Immunity Analysis*

In considering whether the officers are entitled to qualified immunity on Dahl's § 1983 claims, we must first determine whether the facts, viewed in the light most favorable to Dahl, establish a constitutional violation. *See Hope v. Pelzer*, — U.S. —, 122 S. Ct. 2508, 2513 (2002); *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). If no constitutional violation is established, then the officers prevail, and "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201, 121 S. Ct. at 2156. On the other hand, if the facts establish a constitutional violation, we must determine whether, at the time of the violation, the right was clearly established, an inquiry that "must be undertaken in light of the specific context of the case [and] not as a broad general proposition . . . ." *Id.*

B. *Fourth Amendment: False Arrest*

As stated, Dahl claims that her arrest was effected without probable cause in violation of the Fourth Amendment. Probable cause existed if, at the moment the arrest was made, "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" that Dahl had committed or was committing an offense.

11

*See Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534, 537 (1991) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)). Dahl argues that the officers in this case lacked probable cause for two reasons: first, they possessed no evidence relating to any of the elements of § 13A-10-121; and second, they could not reasonably have believed that Dahl was violating § 13A-10-121 in light of certain exculpatory statements she made to McCardle. We disagree with both of these arguments.

To begin with, the officers clearly had evidence relating to some of the elements of § 13A-10-121. That statute provides that: "A person commits the crime of bribing a witness if he offers, confers or agrees to confer any thing of value upon a witness or a person he believes will be called as a witness in any official proceeding with intent to . . . [c]orruptly influence the testimony of that person . . . ." Ala. Code § 13A-10-121(a)(1). The record demonstrates that, at the time of Dahl's arrest, the officers had received information from McCardle — an informant that had proved reliable on at least one previous occasion (the stop and search of Dahl's son) — that Dahl had offered him $10,000 falsely to tell Hargett and the mayor that the police had set up her son. Moreover, the officers' subsequent investigation of Dahl uncovered evidence tending to corroborate McCardle's account. This evidence included Dahl's own statements that: McCardle was wrestling with his "pocketbook" instead of his "conscience"; Dahl would "have to take care of it all during the weekend and worry

12

about getting ripped off"; McCardle need not worry about Dahl upholding her end of the bargain but there were no banks open at that time; and Dahl just wanted to help McCardle with his "situation." Additionally, the police had evidence that, in their last conversation before the scheduled meeting with the mayor, Dahl responded affirmatively to McCardle's statement that he would receive "attorneys fees" if Dahl trusted him. On this record, the officers had evidence from which a prudent person could believe that Dahl had offered McCardle a thing of value to misrepresent the circumstances surrounding the stop and search of her son.

Slightly more problematic is Dahl's contention that the officers lacked any evidence that McCardle was a witness in an official proceeding. It was the lack of evidence on this element that prompted the state trial court to grant Dahl's motion for judgment of acquittal. As Dahl correctly points out, McCardle told the officers only that he was to misrepresent the facts in an informal meeting with the mayor. But the officers reasonably could have concluded that, by prompting McCardle to misrepresent the facts to the mayor, Dahl also was attempting to influence or discredit any testimony that McCardle might give in any upcoming criminal proceeding against her son, for whom an arrest warrant recently had been issued. That the officers had no specific evidence as to this element, such as would convict Dahl at trial, did not prevent them from having probable cause to make the arrest. *See Adams v. Williams,*

13

407 U.S. 143, 149, 92 S. Ct. 1921, 1924 (1972) ("Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."); *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813) ("[T]he term 'probable cause' . . . means less than evidence which would justify condemnation . . . ."); *Kelly v. Serna*, 87 F.3d 1235, 1241 (11th Cir. 1996) ("There is a substantial difference between the quantum of proof necessary to constitute sufficient evidence to support a conviction and that necessary to establish probable cause."); *United States v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983) (affirming finding of probable cause despite lack of evidence of criminal intent).

Similarly, the exculpatory statements referenced by Dahl — her statements that McCardle should tell the truth and not lie to the mayor — did not prevent the officers from having probable cause. While Dahl's exculpatory statements tended to discredit McCardle's version of events, arresting officers, in deciding whether probable cause exists, are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed. Nor does probable cause require certainty on the part of the police. "[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (en banc) (quoting *Hill v. California*, 401 U.S. 797,

14

804, 91 S. Ct. 1106, 1111 (1971)); *see also Brinegar v. United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 1310 (1949) ("In dealing with probable cause . . . as the very name implies, we deal with probabilities."); *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996) ("Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'").

Based on the totality of the circumstances, which included a specific statement from a previously reliable informant that was corroborated by evidence gathered through an independent investigation, the officers had sufficient probability to believe that § 13A-10-121 had been violated. *See McCray v. Illinois*, 386 U.S. 300, 303-04, 87 S. Ct. 1056, 1058-59 (1967) (concluding that officers had probable cause for arrest where personal observations corroborated tip from reliable informant); *Draper v. United States*, 358 U.S. 307, 312-13, 79 S. Ct. 329, 333 (1959) (same); *United States v. Astling*, 733 F.2d 1446, 1460 (11th Cir. 1984) (same); *United States v. Espinosa-Orlando*, 704 F.2d 507, 511-12 (11th Cir. 1983) (same); *cf. Eubanks v. Gerwens*, 40 F.3d 1157, 1160 (11th Cir. 1994) (concluding that officer had arguable probable cause sufficient to confer qualified immunity where arrest was based on tip from informant who had proved reliable in the past). Thus, Dahl failed to demonstrate that she was arrested in violation of the Fourth Amendment. Because there was no constitutional

violation, the officers were entitled to summary judgment, and we need go no further in our qualified immunity analysis.

## C. *Fourth Amendment: Unlawful Search*

In addition to her constitutional claim for false arrest, Dahl claims that the officers violated her rights under the Fourth Amendment both by including false statements in the search warrant affidavit and by failing to disclose in the affidavit that Dahl had told McCardle not to lie. As with Dahl's false arrest claim, however, we conclude that the officers were entitled to summary judgment.

At the outset, we note that Dahl has not linked any of the officers, other than Beeson, to the alleged violation underlying her unlawful search claim. The warrant affidavit upon which this claim is based was submitted only by Beeson, and Dahl points to no evidence that the other officers played any role in applying for the warrant. On this basis alone, the other officers were entitled to summary judgment.

In any event, Dahl has failed to demonstrate that her Fourth Amendment rights were violated in connection with the search warrant application. A search warrant may be voided if the affidavit supporting the warrant contains deliberate falsity or reckless disregard for the truth, *see Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676 (1978), and this rule includes material omissions, *see United States v. Martin*, 615 F.2d 318, 328-29 (5th Cir. 1980). Nonetheless, the warrant is valid if,

16

absent the misstatements or omissions, there remains sufficient content to support a finding of probable cause. *See Franks*, 438 U.S. at 171-72, 98 S. Ct. at 2684.

In this case, Dahl has presented no evidence that Beeson deliberately or recklessly misstated the evidence or omitted any material fact which would negate a finding of probable cause. The alleged fabrications of which Dahl complains come directly from McCardle's written statement to the police and identify "the confidential informant" as the source of the information. (R.2-38, Ex. 19 at 2.) Beeson accurately portrayed the information the police obtained from McCardle, and there is nothing to suggest that he knew this information to be inaccurate. Moreover, the omission of which Dahl complains does not defeat the probable cause determination. As we have explained, the totality of the circumstances provided a sufficient basis to believe that Dahl had violated § 13A-10-121, her exculpatory statements to McCardle notwithstanding, and the omitted facts would not have prevented a finding of probable cause. *See Madiwale v. Savaiko*, 117 F.3d 1321, 1327 (11th Cir. 1997).[7] Because there was no violation of Dahl's constitutional rights, the district court correctly granted summary judgment on her unlawful search claim.

---

[7] We should not be understood to suggest that omissions of fact clearly critical to a finding of probable cause cannot vitiate an affidavit in support of a warrant, where "it is proven that the omissions were made intentionally or with a reckless disregard for the accuracy of the affidavit." *Martin*, 615 F.2d at 329. Here, the omitted facts are not clearly critical to the probable cause determination, nor has Dahl shown them to be intentionally or recklessly made.

17

D. *First Amendment: Retaliatory Arrest*

Dahl also claims that she was arrested in retaliation for her constitutionally protected speech against the police department's recruitment and use of confidential informants. Whatever the officers' motivation, however, the existence of probable cause to arrest Dahl defeats her First Amendment claim. *See Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th Cir. 1998); *see also Keenan v. Tejeda*, 290 F.3d 252, 260 (5th Cir. 2002); *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *Smithson v. Aldridge*, 235 F.3d 1058, 1063 (8th Cir. 2000). Therefore, summary judgment was proper on this claim as well.

E. *Constitutional Claim Against the City*

Finally, Dahl claims that the City inadequately trained and supervised the officers. Because Dahl has not demonstrated that she suffered a constitutional deprivation, however, her constitutional claim against the City fails, and the district court properly entered summary judgment on this claim.

IV. Conclusion

For the foregoing reasons, the district court properly granted summary judgment to the officers and the City on Dahl's constitutional claims.

AFFIRMED.