[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-11800
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-03964-SCJ

JESSIE NELL SMITH,

Plaintiff-Appellant,

versus

CITY OF FAIRBURN, GEORGIA,
JAMES A. MCCARTHY, JR.,
CHARLES L. ISRAEL,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(February 15, 2017)

Before ED CARNES, Chief Judge, HULL and MARCUS, Circuit Judges.

PER CURIAM:

Jessie Nell Smith was arrested based on a warrant obtained by Detective Charles Israel and charged with making terroristic threats against her next door neighbor. She filed this 42 U.S.C. § 1983 lawsuit against Detective Israel, the Chief of the Fairburn police department, and the City of Fairburn, alleging that she was arrested without probable cause and in retaliation for her criticism of the Chief of Police, in violation of her First and Fourth Amendment rights. She also brought several state law claims against the same defendants. The district court granted summary judgment to the defendants. This is Smith's appeal.

## I.

Because we are reviewing the district court's grant of summary judgment to the defendants, we recite the facts of this case in the light most favorable to Smith, resolving all factual disputes and drawing all reasonable inferences in her favor. Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004). We express no opinion as to whether a factfinder would do the same at trial.

## A.

Fairburn city officials had heard of — and from — Smith long before the incident that gave rise to this litigation. Smith characterizes herself as a "citizen watchdog." She began attending city council meetings in 2002 because she "took a great interest in [the] city" and "saw things that [she] wanted to address." Smith spoke "many times" during those meetings. She claims that, although she

sometimes criticized city officials in her public comments, her commentary was "more positive than negative."

In the summer of 2013, Smith turned her attention to the police department's purchase of several new police vehicles. James McCarthy, Fairburn's chief of police, had authorized the purchase of the new vehicles in May. But he had not followed proper procurement procedure because he had not obtained the city council's approval before making the purchase. Chief McCarthy brought this up at a public work session on July 8 and apologized for his mistake. The city council ratified the purchase, but Mayor Mario Avery wrote a memo reprimanding Chief McCarthy for his failure to follow proper procedure.

Smith attended the July 8 meeting and spoke about the improper purchase of police vehicles. She broached the subject again at the next city council meeting on July 22. This time she suggested that other people beyond Chief McCarthy had to have been involved in the mistake and suggested that Chief McCarthy's actions amounted to "theft by taking." The following day, Smith submitted a public records request to the city seeking information about the vehicle purchase. She received a response to this request from the City Administrator a few days later.

### B.

Meanwhile, Smith was having problems with her neighbor, Ronnie Jordan. Jordan had moved in next to Smith approximately five years before the events

3

giving rise to this case.  Although their relationship was initially amicable, it later became hostile.  Jordan "began to have people in and out and noise and music," and Smith began calling the police department "over and over and over."

Around 11:00 p.m. on July 23 — one day after Smith complained for the second time at a city council meeting about the improper purchase of police vehicles — one of Smith's neighbors called the police to report that loud music was coming from Jordan's home.  Officer Jacob Crawford responded to this 911 call and told Jordan that his music was too loud.  Jordan agreed to turn the music down.

But before long the music was loud again and Smith called the police to make a noise complaint.  Officer Crawford as well as Officers Kenneth Hammock and Jason Pridemore responded.  They located Jordan in a shed behind his house; he was drunk, angry, and belligerent.  He blamed Smith for always calling the police on him and Officer Hammock overhead him say: "It was Nell Smith who called, wasn't it?  She has been harassing me for five years now and I am miserable living next to her.  That's okay.  We can play that."  With the assistance of two unidentified women who were present at the scene, the officers were able to calm Jordan down.  The officers issued Jordan a citation and departed.

Later the same night, Smith called the police again, this time because she had heard something strike her house.  During the course of that 911 call, she

4

stated: "I don't know if the neighbors are doing this or what.  I don't want these people to put me to the test."

Several officers returned to Smith's house.  Officer Hammock walked around the house to see if he could locate the cause of the noise.  He found a puncture mark in the siding under Smith's bedroom window.  A piece of concrete about the same size as the hole was on the ground nearby.  Officer Hammock allegedly told Smith: "We know who did it but we can't prove it."  According to Smith, none of the officers even went to Jordan's house to speak with him about the incident.  But Officer Hammock did say he would take the piece of concrete back to the station.

In his incident report, Officer Hammock wrote that: "Ms. Smith stated that she has put up with her neighbor's issues way too long and that she was going to kill him when she got the chance.  Ms. Smith said to me 'I am going to kill him and you can put that in your report.'"[1]  Smith vigorously denies that she made this statement, though she admits that she told the officers that she would do what she had to do to defend herself and her property.  Officer Hammock did not arrest

---

[1] In a "Victim/Witness Statement" written five days after Detective Israel obtained a warrant for Smith's arrest, Officer Hammock again indicated that Smith had made a threat against Jordan.  But this time he claimed she said: "Do not be surprised if you find him dead, because . . . um, I'm going to kill him!  [A]nd you can put that in [your] report."  Officer Hammock also reported that Smith said, "Is there any damage to my car? . . . Because if there is damage to my car, I will go over there now and kill him!"

5

Smith that night based on the statements he claims she made. But he did note those statements in his report.

## C.

The following morning, Chief McCarthy reviewed Officer Hammock's incident report. He then spoke to the captain of the Criminal Investigation Division and Detective Israel about following up on the incident. According to Smith, there is circumstantial evidence to suggest that during this conversation Chief McCarthy ordered Detective Israel to arrest Smith. The defendants contend that he simply directed his subordinates to investigate both Smith and Jordan.

Detective Israel reviewed Officer Hammock's report and interviewed Smith about the incident. During the interview, Smith denied making the threats described in the report. She did say that: "I just told them, I said I got a pistol waiting in there and I . . . hope that nothing happens." She also stated that, "I might have said I, you know, I . . . I feel like killing him or . . . I don't know what . . . I don't know." And she said: "I mean, I'm going to protect myself."

Detective Israel then contacted Officer Crawford (who was on present for at least some part of the investigation into the noise Smith heard outside her home) to discuss the incident.[2] Officer Crawford told Detective Israel that he did not hear

---

[2] It is not clear from the record whether Smith admits or denies that this conversation occurred. In her "Response to Defendants' Statement of Undisputed Material Facts," Smith denies that the conversation occurred. But in her own "Statement of Material Facts Submitted in

6

the threat that Officer Hammock reported, but that he did hear Smith make a conditional threat. Officer Crawford claims Smith threatened to shoot Jordan if there was damage to her car.

Detective Israel prepared a warrant for Smith's arrest. The affidavit in support of that warrant request, in its pertinent part, reads:

> Personally came Charles Israel who on oath says that, to the best of his/her knowledge and belief, Jessie Nell Smith, the Accused, did on or about 7-24-13 within the jurisdiction of this Court, commit the offense of Terroristic Threats in violation of O.C.G.A. 16-11-37, in that the accused did: threaten to kill Ronny [sic] Jordan when she got the chance[.] The threat was heard by Ofc Hammock.

The warrant application was reviewed by Judge Ewing of the Municipal Court of Fairburn. In addition to the information contained in the affidavit, Detective Israel told Judge Ewing that Smith had told the officers they could put her threat in their report.[3] Detective Israel also told the judge about his conversation with Officer

---

Opposition to Defendants' Motion for Summary Judgment," she indicates that Detective Israel did speak to Officer Crawford before seeking a warrant. Because Smith's Fourth Amendment argument would be stronger if Officer Crawford had told Detective Israel that he heard only a conditional threat and did not hear the threat related in Officer Hammock's report, we assume for the sake of this appeal that the conversation did occur. Kingsland, 382 F.3d at 1226 (explaining that, in reviewing a grant of summary judgment, "[w]e review the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant" ).

[3] Smith disputes this fact in her brief on appeal. But she admitted that Detective Israel told Judge Ewing these things in her "Response to Defendants' Statement of Undisputed Material Facts" in the district court. She is bound by that admission. Williams v. Airborne Express, Inc., 521 F.3d 765, 766 (7th Cir. 2008) ("Williams admitted most of the relevant facts in his response to Airborne's statement of undisputed facts. In his appellate briefs he now tries to contradict some of what he admitted at summary judgment, but he is bound by his

Crawford and suggested that he had spoken to Officer Hammock, even though he hadn't. Smith was arrested by several of Detective Israel's fellow officers.

Following Smith's arrest, Detective Israel asked Officers Crawford, Hammock, Glantz, and Pridemore — all of whom responded to the final 911 call — to prepare supplemental witness statements describing their interactions with Smith.[4]  Their accounts differed as to precisely what Smith said and whether they heard her make any threat at all.[5]

### D.

A grand jury declined to return a bill of indictment against Smith and the charges against her were dropped.  Smith then filed this lawsuit against the City of Fairburn, Chief McCarthy, and Detective Israel.  Her complaint asserted four

---

admissions.").  Cf. Cooper v. Meridian Yachts, Ltd., 575 F.3d 1151, 1177–78 (11th Cir. 2009) ("[T]he general rule [is] that a party is bound by the admissions in his pleadings." (quoting Best Canvas Prod. & Supplies, Inc. v. Ploof Truck Lines, Inc., 713 F.2d 618, 621 (11th Cir. 1983) (alterations in original))).

[4] There is some uncertainty in the record about which officers were at the scene and how long they were there.  Officers Glantz and Crawford, the two officers whose accounts are most helpful to Smith's case, claim that they arrived at the scene after the call was well underway. Obviously, if that is the case, they may simply have arrived too late to hear her alleged terroristic threat. Smith, on the other hand, seemed to suggest in her deposition that Officer Glantz was at the scene the whole time, even though the officer's report and a departmental log suggest otherwise.  We resolve the discrepancy in Smith's favor and assume for the sake of argument that Officer Glantz was on the scene the entire time.

[5] These differences do not affect our decision in this case because there are any number of reasons an officer's account of a suspect's statements might vary and there is no reason that Detective Israel was required to credit one version of Smith's statements over another.

claims.  First, Smith asserted a Fourth Amendment malicious prosecution claim[6] against Detective Israel, claiming that he obtained an arrest warrant and caused her arrest even though he knew probable cause was lacking.  Second, she asserted a First Amendment retaliatory arrest claim against Detective Israel and Chief McCarthy, alleging that she was arrested in retaliation for her public criticism of Chief McCarthy at the July 8 and 22 city council meetings.   Third, she asserted a claim against the City of Fairburn for those alleged constitutional violations based on the Supreme Court's decision in Monell v. Dep't. of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018 (1978).  Finally, she asserted state law claims against Detective Israel, Chief McCarthy, and the City of Fairburn.

The district court concluded, among other things, that Smith's arrest was supported by probable cause and granted summary judgment to the defendants on all of Smith's claims.  She challenges only the grant of summary judgment on her Fourth Amendment claim against Detective Israel, her First Amendment claim against Chief McCarthy, and her state law claim against the City of Fairburn.

---

[6] Smith characterizes this as a "false arrest" claim, but as the district court properly pointed out, "an unlawful arrest pursuant to a warrant will be more closely analogous to the common law tort of malicious prosecution," than the common law tort of false arrest.  Calero-Colon v. Betancourt-Lebron, 68 F.3d 1, 4 (1st Cir. 1995); see also Whiting v. Taylor, 85 F.3d 581, 585 (11th Cir. 1996) ("Obtaining an arrest warrant is one of the initial steps of a criminal prosecution. Under these circumstances (that is, where seizures are pursuant to legal process), we agree with those circuits that say the common law tort "most closely analogous" to this situation is that of malicious prosecution.").  Smith does not challenge the district court's characterization of her Fourth Amendment claim as a "malicious prosecution" claim and we adopt that characterization here.  In any event, the existence of probable cause defeats her claim regardless of how it is characterized.

II.

We review <u>de</u> <u>novo</u> a district court's grant of summary judgment.  <u>Reeves v.</u> <u>C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 807 (11th Cir. 2010).  We will affirm a grant of summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "We review the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant."  <u>Kingsland</u>, 382 F.3d at 1226.

III.

We begin with Smith's Fourth Amendment claim against Detective Israel. Smith contends that Detective Israel violated her Fourth Amendment rights by seeking an arrest warrant and causing her arrest without probable cause.  In order to successfully prosecute this claim, Smith must first defeat Detective Israel's defense of qualified immunity.

Law enforcement officers are entitled to qualified immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Holmes v.</u> <u>Kucynda</u>, 321 F.3d 1069, 1077 (11th Cir. 2003).  Qualified immunity "liberates

government agents from the need to constantly err on the side of caution by protecting them from liability and the other burdens of litigation, including discovery." Id. (quotation marks omitted). We conclude that Detective Israel is entitled to qualified immunity from both Smith's claim that she was arrested without probable cause and her claim that he omitted exculpatory information from his warrant application.

## A.

"The Constitution does not guarantee that only the guilty will be arrested." Baker v. McCollan, 443 U.S. 137, 145, 99 S. Ct. 2689, 2695 (1979). Instead, it requires only that there be probable cause to support an arrest. See Madiwale v. Savaiko, 117 F.3d 1321, 1325 (11th Cir. 1997). And even "officers who make an arrest without probable cause are entitled to qualified immunity if there was arguable probable cause for the arrest." Kingsland, 382 F.3d at 1232. In order to determine that, "we must inquire whether reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest" Smith. Id. (quotation marks omitted). Smith argues that Detective Israel did not have even arguable probable cause in this case and therefore not only violated her Fourth Amendment rights but also is not entitled to qualified immunity. We disagree. Detective Israel not only had arguable probable cause to arrest Smith, he had actual probable cause to do so.

11

Probable cause determinations are made "with a common sense view to the realities of normal life." Marx v. Gumbinner, 905 F.2d 1503, 1506 (11th Cir. 1990). The probable cause standard requires only that there be a "fair probability" or "substantial chance" that criminal activity is afoot. See Illinois v. Gates, 462 U.S. 213, 238, 243 n.13, 103 S. Ct. 2317, 2332, 2335 n.13 (1983). That standard "is met when the facts and circumstances within the officer's knowledge . . . would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Morris v. Town of Lexington Alabama, 748 F.3d 1316, 1324 (11th Cir. 2014) (quotation marks omitted) (omission in original).

Under Georgia law, "[a] person commits the offense of . . . terroristic threat[s] when he threatens to commit any crime of violence. When the communication of a threat is done to terrorize another, the crime of terroristic threats is complete." Brown v. State, 680 S.E.2d 579, 581 (Ga. Ct. App. 2009) (quotation marks and citations omitted). In other words, to commit the crime of terroristic threats, a defendant must have both made a threat and have intended to communicate that threat in some way to a victim. Id. "That the message was not directly communicated to the victim would not alone preclude a conviction where the threat is submitted in such a way as to support the inference that the speaker

12

intended or expected it to be conveyed to the victim." Sidner v. State, 696 S.E.2d 398, 400 (Ga. Ct. App. 2010) (emphasis omitted).

Because Detective Israel was not present when officers responded to Smith's house after she heard a noise outside her bedroom, he had no personal knowledge of what was said that night. Instead, he based his probable cause determination on Officer Hammock's incident report and his own follow up investigation of the matter. It is well established that "[o]bservations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number." United States v. Ventresca, 380 U.S. 102, 111, 85 S. Ct. 741, 747 (1965). That Smith denies making the threat that Officer Hammock put in his report doesn't matter, because Detective Israel was not required to believe her. See Beauchamp, 320 F.3d at 744 ("[C]riminal suspects frequently protest their innocence, and a suspect's denial of guilt generally is not enough to trigger a duty to investigate in the face of a reasonably believable witness and readily observable events."); Glenn v. City of Tyler, 242 F.3d 307, 313 n.3 (5th Cir. 2001) ("[P]robable cause is not destroyed by a suspect's denial.").

Having concluded that Detective Israel could rely on Officer Hammock's report (as well as his conversation with Officer Crawford), it is obvious that he had probable cause to believe that Smith made a threat against Jordan. But Smith protests that, even if that is true, Detective Israel had no probable cause to believe

13

that she had any intent to communicate that threat to Jordan. She argues that telling Officer Hammock he could put her threat in his report was not enough to suggest any intent to communicate her threat to Jordan.

It is not clear from Georgia law whether she is correct on that point. There are several cases that suggest she is not. Cobble v. State, 603 S.E.2d 86, 87–88 (Ga. Ct. App. 2004) (holding that threats made in the presence of a law enforcement officer were sufficient evidence to indicate an intent to communicate because the victim had a protective order against the defendant and the defendant had just violated that order); Nassau v. State, 715 S.E.2d 837, 840 (Ga. Ct. App. 2011) (concluding that there was sufficient evidence of an intent to communicate in part because the defendant told a power company night dispatcher to put his threats against the power company's technicians in his account records); Brown v. State, 680 S.E.2d 579 (Ga. Ct. App. 2009) (holding that a defendant's statements to his attorney that he was going to kill his wife and mother-in-law could support a conviction for terroristic threats because the defendant's frequent use of law books and greater-than-usual appreciation of the contours of attorney-client privilege would allow a jury to conclude that the defendant knew the attorney would have had an ethical duty to report the threat).

But Cobble, Nassau, and Brown could be distinguished from this case. Although Smith and Jordan have an established hostile relationship like the

14

defendant and victim in <u>Cobble</u>, there was no protective order in this case.  Unlike

the targets of the threats in <u>Nassau</u> who could, presumably, view the defendant's

account records, it is not clear Jordan could view Officer Hammock's report.  And

there is nothing in the record to suggest that Smith, despite her frequent contact

with law enforcement, ever discussed the proper police response to threats against

a third party with any of those officers.

Moreover, there are also some cases that support Smith's view of what is

sufficient to demonstrate intent to communicate.  For instance, in <u>Sidnar v. State</u>,

696 S.E.2d 398, 399 (Ga. Ct. App. 2010), the defendant called 911 threatening to

"take products [sic] into [his] own hands" and "go out and kick somebody's

fucking ass" if the police did not respond to his fireworks complaint.  The Court of

Appeals concluded that this did not amount to a terroristic threat because —

despite the fact that the threat was made to law enforcement — it was not against

law enforcement, it did not identify a particular victim, it appeared to be designed

simply to get the police to respond to the scene, and there was no evidence that the

defendant intended the threat to be communicated.  <u>Id.</u> at 400.  <u>Accord</u> <u>Stephens v.</u>

<u>State</u>, 610 S.E.2d 143, 143–44 (Ga. Ct. App. 2005) (holding that a hospital

employee could not be convicted of terroristic threats after he told one of his

supervisors that he wanted a transfer because he felt like killing another supervisor

and wrote a letter to human resources to that effect, because he went out of his way

15

to avoid contact with the supervisor he disliked and clearly did not intend for the letter to be delivered to her); Koldeway v. State, 714 S.E.2d 371, 373–74 (Ga. Ct. App. 2011) (holding that a defendant had no intent to communicate his threats to a victim where he made them for the purpose of obtaining a diagnosis and treatment from mental health professionals).

But this case can be distinguished from Sidnar, Koldeway, and Stephens. Unlike the defendant in Sidnar, Smith did identify a particular victim. And (as discussed above) there was at least some circumstantial evidence that could suggest that Smith intended her threat to be communicated to Jordan — which was not the case in Stephens or Koldewey. See Koldeway, 714 S.E.2d at 374; Stephens, 610 S.E.2d at 144.

In short, some cases (which could be distinguished) suggest that Smith's statement to Officer Hammock could support a terroristic threats charge and some cases (which could be distinguished) suggest that it could not. A reasonable officer could come to either conclusion. As a result, even if Detective Israel was wrong to conclude that Smith's statement demonstrated intent to communicate under Georgia's terroristic threats statute, his error was a reasonable mistake of law. And a reasonable mistake of law does not destroy probable cause. Cahaly v. Larosa, 796 F.3d 399, 408 (4th Cir. 2015) ("[O]fficers may have probable cause based on reasonable mistakes of law."). Cf. Heien v. North Carolina, 574 U.S.

16

___, 135 S. Ct. 530, 536–540 (2014) (holding that an officer has reasonable suspicion to conduct traffic stop even when his suspicion that a law has been violated is based on a reasonable mistake of law).  As a result, Smith's alleged statements would support a finding of probable cause.[7]

Of course, Detective Israel did not parse the decisions discussed above before seeking a warrant for Smith's arrest.  Few, if any, officers would.  And he indicated that he was not aware that intent to communicate the threat was an element of terroristic threats.  But that doesn't matter.  In determining the existence or non-existence of probable cause, we do not ask what evidence the officer seeking an arrest warrant thought he needed to establish probable cause.  We ask whether a reasonable officer, knowing the facts that the officer in question knew, would have had sufficient evidence to believe that probable cause existed.  Detective Israel did here.

We also reject Smith's argument that Detective Israel should have investigated further before seeking a warrant for her arrest.  "An arresting officer is required to conduct a reasonable investigation to establish probable cause."  Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).  But officers do not have "an affirmative obligation to seek out exculpatory information of which the officer

---

[7] Although the defendants do not mention Heien in their briefs, "[w]e can affirm [the district court's decision] on any ground that finds support in the record."  Big Top Koolers, Inc. v. Circus-Man Snacks, 528 F.3d 839, 844 (11th Cir. 2008) (quotation marks omitted).

17

is <u>not</u> aware" or "track down every lead" before making a probable cause determination.  <u>Kelly v. Curtis</u>, 21 F.3d 1544, 1551–52 (11th Cir. 1994).  Here Detective Israel interviewed Smith, heard her side of the story, and simply determined that it was not credible.  He also talked to Officer Crawford in addition to reviewing Officer Hammock's incident report.  While Officer Crawford did say that he only heard Smith make a conditional threat, Detective Israel was not required to assume that he was correct and Officer Hammock was mistaken.  Nor was Detective Israel required to track down every other officer on the scene or explore every possible path of investigation before deciding to get an arrest warrant for Smith.  "Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused."  <u>Ahlers v. Schebil</u>, 188 F.3d 365, 371 (6th Cir. 1999).[8]

B.

Although it is not entirely clear from her brief to this Court or her filings in the district court, it appears that Smith also contends that Detective Israel violated her Fourth Amendment rights by including false information in and omitting exculpatory information from his warrant application.  Assuming for present

---

[8] Smith also argues that probable cause was lacking because Detective Israel knew — from various personal interactions with Smith — that she was not violent and was afraid of her neighbor.  But that information does nothing to destroy probable cause here, because it has very little (if any) relevance to the question of whether probable cause existed.  Even people who are not usually violent, are friends with police officers, and are afraid of their neighbor can be guilty of a crime.

purposes that Smith properly pleaded and raised this contention, we conclude that it is without merit.

"[W]hen the Fourth Amendment demands a factual showing sufficient to comprise probable cause, the obvious assumption is that there will be a truthful showing." Franks v. Delaware, 438 U.S. 154, 165, 98 S. Ct. 2674, 2681 (1978). A warrant is invalid when (1) an officer's warrant application contains information that is deliberately false or which was included with reckless disregard for the truth and (2) the warrant would not support a finding of probable cause without that information. See Dempsey v. Bucknell Univ., 834 F.3d 457, 470 (3d Cir. 2016); Dahl, 312 F.3d at 1235. A warrant is also invalid when an officer deliberately or recklessly omits material information from his application, but only if that information would have destroyed probable cause. See Dempsey, 834 F.3d at 470; Dahl, 312 F.3d at 1235. As a result, "qualified immunity will not shield [an officer] from liability for such false statements [or omissions], if [they] were necessary to the [finding of] probable cause." See Jones v. Cannon, 174 F.3d 1271, 1285 (11th Cir. 1999).

In this case, Smith focuses on (1) Detective Israel's failure to inform Judge Ewing that she had denied making the threat, albeit not emphatically, when he interviewed her and (2) the fact that Detective Israel told Judge Ewing that he spoke to Officer Hammock before seeking the warrant when he really had not. But

19

those alleged defects would not have made a difference. Judge Ewing still could have credited Officer Hammock's version of events and found probable cause even if these misstatements and omissions were cured. As a result, Smith could not succeed on this claim even if it were properly pleaded.[9]

C.

For those reasons, Detective Israel is entitled to qualified immunity from Smith's Fourth Amendment claims.

IV.

Smith's First Amendment claim against Chief McCarthy fails for the same reason her Fourth Amendment claim against Detective Israel did: Detective Israel had probable cause to procure a warrant for Smith's arrest. Dahl, 312 F.3d at 1236 ("[T]he existence of probable cause to arrest Dahl defeats her First Amendment claim."). Even assuming that Smith has presented enough evidence to allow a reasonable jury to conclude that Chief McCarthy ordered Detective Israel to arrest Smith (as opposed to simply telling him to investigate her alleged threats and Jordan's alleged criminal trespass), that order would not amount to a violation of her constitutional rights as long as there was at least arguable probable cause to

---

[9] Smith also contends that Detective Israel's warrant application "was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Given that (1) we concluded in Section III.B, supra, that Detective Israel had probable cause to pursue Smith's arrest and (2) Detective Israel informed the magistrate of the most important facts relevant to that determination (i.e. what Officer Hammock reported that Smith said), that contention fails.

20

seek her arrest.  Id.  Because Detective Israel did have actual probable cause to arrest Smith, it doesn't matter that Chief McCarthy's order might have been motivated by personal animus.  See Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); Miller v. Harget, 458 F.3d 1251, 1260 (11th Cir. 2006) ("It is well settled that an officer's subjective motivations do not affect whether probable cause existed.").

## V.

The parties disagree as to whether Smith's state law claims against the City of Fairburn sound in negligence or false arrest.  Smith's complaint states only a claim for false arrest.

The state law count of her complaint is captioned "false arrest."  The caption also refers to O.C.G.A. § 51-7-1, a Georgia statute creating a cause of action for false arrest.  And the entire count is premised on "the acts and omissions of [Detective] Israel and [Chief] McCarthy" which led to "the illegal arrest and detention of Smith with malice and without probable cause" — language that parrots the false arrest statute.  See O.C.G.A. § 51-7-1 ("An arrest under process of law, without probable cause, when made maliciously, shall give a right of action to the party arrested.").  Clearly, the count was meant to articulate a false arrest claim. It is not transformed into a negligence claim simply because Smith is trying to hold

21

the city liable for her alleged false arrest through the doctrine of respondeat superior.

We therefore construe Smith's state law claim against the city as a false arrest claim. That claims fails because we have determined that, even considering all the evidence in the light most favorable to Smith, Detective Israel did have probable cause to seek a warrant for Smith's arrest. O.C.G.A. § 51-7-1 (requiring that an arrest be "under process of law," "without probable cause," and "malicious" to support an action for false arrest).

## VI.

For those reasons, the district court properly granted summary judgment to the defendants.

**AFFIRMED.**